Filed 10/3/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.M. et al., Persons Coming Under the Juvenile Court Law. | B293382 |
| | (Los Angeles County Super. Ct. No. 17CCJP00694) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Appellant, | |
| v. | |
| A.S. et al., | |
| Defendants and Respondents; | |
| J.M., a Minor, etc., et al., | |
| Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Julie Fox Blackshaw, Judge. Reversed.

Office of the County Counsel, Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and

Appellant Los Angeles County Department of Children and Family Services.

      Patricia G. Bell, under appointment by the Court of Appeal, for Appellants J.M. and H.M.

      Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Respondent A.S.

      Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Respondent T.M.

A.S. (Mother) and T.M. (Father) have two children, three-year-old J.M. and two-year-old H.M. (collectively, the Minors).[1] The Los Angeles Department of Children and Family Services (the Department) filed a dependency petition alleging Mother and Father abused drugs and engaged in domestic violence. Shortly thereafter, Mother absconded with the Minors and their whereabouts were unknown for roughly nine months. When Mother eventually surrendered the Minors to a maternal relative, the juvenile court held a jurisdiction hearing and concluded it must dismiss the petition because there was, by then, a lack of evidence of current risk of harm to the Minors. This court issued a writ of supersedeas to stay the juvenile court's dismissal order and we now consider whether substantial evidence supports the court's decision to decline to assume jurisdiction over the children.

## I. BACKGROUND

### A. *Initial Investigation*

The family came to the Department's attention following a referral alleging Mother and Father were physically fighting each other, selling drugs, and yelling and cursing at the Minors.

A Department social worker and a public health nurse visited Mother's residence a few days later. Father was inside getting dressed when they arrived. Mother told the social worker that Father did not live in the home and was on his way to work. The social worker asked Father if he would participate in an

---

[1] These were the children's ages when dependency proceedings commenced.

interview, but Father ignored the question, kissed Mother, and left.

So rebuffed, the social worker interviewed only Mother. She said she had been a dependent child herself—entering "the system" at one year old and never reunifying with her parents. Mother admitted she yells at the Minors but denied cursing at them. Mother also denied fighting with Father; she asserted he "'just leaves'" when conflicts arise between the two of them. When asked about drug use, Mother initially denied it, but she later admitted to smoking marijuana, according to her, "'[m]aybe like once a week'" outside of the home and not in the presence of the Minors. Mother reported J.M. had asthma (assertedly without an attack in two years) and H.M. had a heart murmur for which she needed to be seen by a cardiologist every six months.

A Department social worker contacted Father a few days later and asked if he would meet to discuss the allegations. Father screamed at the social worker, asking what he had to do with the situation. Father stated he lived in his car, did not live with Mother, and "'just come[s] over and do[es] what I have to do with my kids.'" He admitted to smoking marijuana but he denied smoking while the Minors were in his care or while he is in Mother's home. Father admitted to being on criminal probation for domestic abuse but denied there had been any recent domestic violence between him and Mother.[2]

---

[2]     The Department social worker later spoke to Father's probation officer who stated Father was given five years of formal probation and still needed to complete domestic violence classes.

4

The Department social worker spoke to Mother several more times before filing a dependency petition. During one conversation, the social worker asked Mother if she was willing to take a drug test. Mother said she had "'no time for this'" and screamed at the social worker. During another conversation, Mother stated she knew there was a restraining order prohibiting contact between her and Father but said she was working with Father to get the order lifted. When the social worker told Mother the Department had received more than one call regarding her and Father having arguments and possible physical altercations, Mother stated those allegations were false, she and Father do not fight, and "'all this stuff is a misunderstanding.'" Mother admitted there had been conflict between her and Father in the past, but she said it was because they were young at the time.

The social worker also spoke to the Minors' maternal grandmother, with whom Mother had been building a relationship. Maternal grandmother stated Mother and Father did not have any problems and she was not concerned for the Minors.

### B. *Mother Absconds after the Department Files a Petition and Obtains a Removal Order*

In September 2017, the Department filed a petition in juvenile court alleging the Minors were children described by Welfare and Institutions Code section 300, subdivision (a) (substantial risk of serious physical harm inflicted nonaccidentally by a parent) and subdivision (b) (substantial risk of serious physical harm from a parent's failure or inability to

5

adequately supervise or protect the child).[3]  The petition alleged Mother and Father had a history of engaging in violent altercations in J.M.'s presence and specifically referenced a violent altercation that occurred in April 2015 when Mother was pregnant with H.M.  It also referenced Mother and Father's violation of the criminal restraining order.  The petition additionally alleged Mother and Father were current abusers of marijuana, which rendered them incapable of providing regular care for the Minors, who were of such tender age that they require constant care and supervision.

At the initial detention hearing held in connection with the filed petition, the juvenile court ordered the Minors released to Mother's care.  Roughly two weeks later, Mother missed an on-demand drug test.  She appeared for a drug test a few days later, and tested positive for amphetamine, methamphetamine, cannabinoids, and cocaine metabolite.  A Department social worker informed Mother of the positive results and asked Mother about her drug use.  Mother denied using amphetamine, methamphetamine, or cocaine, and she attempted to explain those positive results away by saying she had taken pain medication and an ecstasy pill the day before the test.[4]  Mother did admit to using marijuana, but she maintained she uses it only occasionally, and only when the children are not there.

---

[3]    Undesignated statutory references that follow are to the Welfare and Institutions Code.

[4]    A Department social worker spoke to an employee at the testing center who stated taking an ecstasy pill would not result in a positive test for amphetamine, methamphetamine, and cocaine.

The Department thereafter sought a removal order based on Mother's drug use—as evidenced by multiple missed drug tests, her positive test for high levels of illicit drugs, her denial of drug use indicated by test results, and her admission that she had taken ecstasy. The juvenile court approved the Department's request and issued a removal order on November 1, 2017.

The Department attempted to detain the Minors the next day, but the social worker was unable to contact Mother via her cell phone and Mother was not home when Department social workers visited to serve the removal warrant. Mother later met the social workers at a Department of Public Social Services office. The social workers invited Mother into an interview room. Mother asked if the Department was going to take the Minors. When the social workers said yes and explained a removal warrant had issued for the children, Mother got up from her seat, grabbed the children, and left the building. The social workers followed Mother into the parking lot and tried to talk to her. Mother put the Minors in car seats and said "'I am not giving up my kids just like that. You are not going to do what they did to my mom. You will not do this to me without my family.'" She then drove off without buckling J.M.'s seat belt. And for the following nine months, Department personnel would be unable to determine where she and the children were living.

C. *The Amended Petition and the Jurisdiction Report*

The Department filed an amended dependency petition shortly after Mother left with the children that added allegations regarding Mother's positive test for amphetamine, methamphetamine, cocaine, and marijuana. The Department

7

requested the Minors be detained at large and the juvenile court issued protective custody warrants.

Notwithstanding Mother's decision to abscond with the Minors, the Department prepared and submitted to the juvenile court a jurisdiction and disposition report in mid-November 2017. The report indicated that although the Department did not know where Mother and the Minors were living, a Department investigator managed to speak by phone with Mother about the case.

Regarding the domestic violence allegations, Mother asked why the Department was "'bring[ing] something up from the past,'" stating the Minors were not around "'when we were going through something.'" Mother also stated the restraining order expired before J.M. was born, and that she and Father love each other. Regarding the allegations that Mother abused drugs, Mother stated she was "'chilling with a friend'" when she "'was slipped something.'" Mother said she has a medical marijuana card and uses marijuana to help her eat. Regarding the allegations that Father abuses marijuana, Mother stated she was sure he smokes, but she also said she had not seen him in three months.

A Department investigator also spoke to Father by phone. He denied hitting Mother, denied knowing whether Mother abused drugs, and stated the Department could not prove he had used marijuana because he had not submitted to drug testing. Father was rude and verbally aggressive, and he said he did not want any notice or any documents related to the case.

The juvenile court held a hearing in late November 2017. Mother was not present (she was still at large with the Minors) but Father was present in custody (he had been returned to

8

prison for a reason the record does not disclose). The juvenile court made a visitation order for Father and inquired whether he knew the whereabouts of Mother and the Minors. Father claimed not to know. After the hearing, the Department continued making efforts to locate Mother and the Minors, but it was unable to do so, though it managed at least one more brief phone contact with Mother.

### D. The Children Are Returned and the Proceedings Resume

The Department did not obtain custody of the Minors until August 13, 2018, when a maternal relative told a social worker that she had custody of the Minors and would bring them to court. The juvenile court held a hearing that same day to recall the outstanding warrants. Mother was present at the hearing and the court confirmed a notice address for Mother, telling her "[i]f a notice is sent to this address about a court hearing, you will be expected to come to court." Mother's response was, "Yes, ma'am." The juvenile court also ordered Mother to be back in court for an adjudication hearing on October 18 and Mother said, "I will be here." The Minors were placed with their maternal aunt.

The Department submitted an updated jurisdiction report in advance of the October 18, 2018, hearing. The body of the report lists four drug tests for Mother, three of which were no shows and one of which was the positive test on October 13, 2017, alleged in the amended petition. However, there were nine drug test reports attached to the jurisdiction report: the positive report for amphetamine, methamphetamine, cannabinoids, and cocaine metabolite on October 13, 2017; a positive report for cannabinoids

9

on October 31, 2017; three "no show" reports from the period *before* Mother left with the Minors (August 4, 2017, August 18, 2017, and October 11, 2017); and four "no show" reports from test dates *after* Mother and the Minors had been located and appeared in court (August 24, 2018, August 27, 2018, September 5, 2018, and September 14, 2018). The updated jurisdiction report revealed the Department had been unable to interview Mother or Father since the Minors' return despite unannounced visits to last known addresses and multiple attempts at phone contact.

A Department employee interviewed the Minors' maternal aunt regarding the allegations in the petition. She said Mother used to tell her she and Father had gotten into physical altercations, but maternal aunt had not observed any marks or bruises. The maternal aunt also said Mother smokes marijuana but she had never seen Mother use drugs around the children. The maternal aunt was then living with the Minors in the apartment the children had previously inhabited with Mother.[5]

The Department investigator spoke to J.M. (then 4 years old) during the visit.[6] When asked when the last time he saw his mother was, J.M. said "'she went to the store.'" The maternal aunt claimed she told the Minors that Mother was at work or at the store and they did not know she wasn't actually living there.

---

[5]     The room in which the maternal aunt was sleeping did not have a bed, and the maternal aunt reported she was sleeping on a blanket on the floor. The room where Mother and Father were previously living had a neatly made bed and an air mattress.

[6]     H.M. had just turned three years old at the time and was not interviewed.

10

J.M. denied seeing Mother and Father fight, and denied being fearful of either.

### E.    The 2018 Jurisdiction Hearing

The jurisdiction hearing finally went forward on October 18, 2018.  Neither Mother nor Father were present.

The juvenile court stated it was troubled "by the fact that the [domestic violence] allegations are old," noting "this family was at-large for a period of time, which is why they are old, but I need to find current risk today . . . ."  The court acknowledged Mother had tested positive for "a lot of drugs" in October 2017, but said it still needed to find there was a nexus to the Minors' care.  The court asked counsel, "[w]hy can't we have evidence of current risk?"  Counsel for the Department and the Minors responded the reason there was not more evidence of current risk to the children was because "Mother . . . A.W.O.L.'d with the children for the year" and, in the weeks after being located, the parents had been uncooperative and failed to respond to the social worker's efforts to contact them.

The court decided it would dismiss the petition.  It explained its reasoning on the record:  "I can't sustain it under the law.  I need current risk.  I need a nexus to the care of the children.  Unfortunately, if it were more recent violence and we had evidence that there was ongoing violence, perhaps it would be sustainable, but I don't have that evidence.  The Mother's drug use, the one positive test, is a year ago.  I really don't know what the situation is with her.  Just because she has not been cooperative with the Department does not create any kind of presumption that she is currently using drugs.  And then, secondly, under the law, I need current risk and I need evidence

11

the children are not being cared for.  I don't have it."  The Department and the Minors requested a stay, which the juvenile court denied.

Shortly thereafter, the Department filed a petition for supersedeas and requested an immediate stay of the dismissal order.  This court granted an immediate stay and then granted the petition for writ of supersedeas, which stayed the court's order dismissing the petition pending the resolution of this appeal.

## II.  DISCUSSION

There are many cases holding that when a dependency petition alleges jurisdiction under section 300, subdivision (b)(1) based solely on risk of harm to a minor (rather than a harm already suffered), a juvenile court must find the risk of harm exists *at time of the jurisdiction hearing* to take jurisdiction over the minor.  (See, e.g., *In re N.S.* (2016) 245 Cal.App.4th 53, 62 [citing cases].)  Here, the juvenile court found there was insufficient evidence of such a "current" risk because most of the evidence in the record concerned events that occurred over a year before, i.e., before Mother absconded with the Minors in violation of the court's removal order.  The reason why the juvenile court erred in so finding can be stated simply: a parent cannot use the "at the time of the hearing" rule as a sword, rather than a shield.  As we shall explain, a court errs when it dismisses a petition for lack of sufficient evidence of *current* risk when the reason why such evidence is lacking is because a parent absconded with her children and wrongfully prevented the Department from monitoring their welfare.

12

"Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the 'child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, or . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse.' (§ 300, subd. (b)(1).)" (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.) A dependency court is not required to "wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216 (*Christopher R.*).) Where jurisdictional allegations are based solely on risk to the child, and not on past injury, a juvenile court ordinarily determines whether a substantial risk of harm exists at the time of the jurisdiction hearing. (E.g., *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993; *In re T.V.* (2013) 217 Cal.App.4th 126, 133; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1435.)

The juvenile court in this case issued an order to remove the Minors from Mother's custody. That removal order was predicated on the court's express findings that there was probable cause to believe the Minors were children described by section 300 and probable cause to detain the Minors from Mother because continuance of their care in her home would be contrary to the children's welfare. These findings, of course, were well justified. Jurisdiction under section 300, subdivision (b) lies where there is substantial risk a child will suffer serious physical harm as a result of a parent's drug abuse. Mother was the sole primary caretaker of the Minors, both of whom were children of

13

"tender years." (*Christopher R., supra*, 225 Cal.App.4th at p. 1219 [children six years old or younger are children of "'tender years'"].) One of Mother's drug tests (before she absconded with the Minors) showed she had amphetamine, methamphetamine, and cocaine metabolite in her system. She admitted to smoking marijuana, and tested positive for marijuana on two occasions. Mother also missed several other drug tests in the first few months of the dependency proceedings. Father admitted daily marijuana use. Coupled with this evidence of drug use was evidence the parents had failed to fulfill their obligation to ensure the Minors had proper medical care: Though H.M. was supposed to see a cardiologist every six months to monitor her heart murmur, she had missed two consecutive appointments by the time the Department began investigating the children's welfare.[7]

As we have already detailed, Mother absconded with the Minors after the removal warrants issued in November 2017—and *knowing* the warrants had issued. The Minors' whereabouts were unknown for nine months thereafter, until August 13, 2018, when Mother and the Minors made an appearance in court to recall the outstanding warrants. The juvenile court held its jurisdiction hearing just two months later, on October 18, 2018,

---

[7]    Cases cited by Mother and Father, *In re Rebecca C.* (2014) 228 Cal.App.4th 720 (*Rebecca C.*) and *In re Drake M.* (2012) 211 Cal.App.4th 754 (*Drake M.*), are easily distinguished from the facts just recited. In *Rebecca C.*, the minor was thirteen years old, and thus not of so tender an age that drug abuse presumptively constituted neglect. (*Rebecca C., supra*, at p. 727.) In *Drake M.*, the father demonstrated that though he used marijuana regularly, he was never the child's sole caretaker while under the influence. (*Drake M., supra*, at p. 761.)

and during this intervening time, the Department's attempt to make an unannounced visit at Mother's last known address was unsuccessful, Mother and Father did not return multiple telephone calls from the social worker, and the Department had only limited interaction with the Minors themselves, who were then being cared for by the maternal aunt. The parents' attorneys nevertheless argued—and the juvenile court agreed— the petition must be dismissed for lack of evidence of a current risk of serious harm to the Minors. We review this decision for substantial evidence. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199; see also *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 436 ["[A]n order based upon improper criteria or incorrect assumptions calls for reversal "'even though there may be substantial evidence to support the court's order'"'"].)

We reject Mother and Father's argument that the delay in holding the jurisdiction hearing means the evidence of risk of harm (most from the fall of 2017) was stale and did not warrant jurisdiction by the time of the jurisdiction hearing in October 2018. Indeed, the position the parents take strikes us as a bit rich. The reason why there was not more recent evidence is because Mother absconded with the children so the dependency proceedings could not continue. Whatever the merits of the "at the time of the hearing" rule for assuming jurisdiction in a mine-run dependency case, we are convinced that rule should not apply to frustrate dependency jurisdiction when a parent's wrongful conduct is the cause of the delay. The rationale the juvenile court accepted would encourage parents to defy court orders and resist Department efforts to monitor the welfare of children knowing, if they are able to delay long enough, the "at the time of the hearing" rule will forestall a jurisdiction finding that otherwise

15

would have been wholly proper.  That is not how the law works.
Rather, the juvenile court's obligation in a case like this is to
assess whether the evidence that is before it—without any
consideration of the passage of time attributable to Mother's
misconduct—warrants dependency jurisdiction.  That is not what
the court did, and the order dismissing the petition is therefore
infirm.

Furthermore, the juvenile court was incorrect, in any event,
that there was no evidence of current risk.  To the contrary, since
Mother's return when the outstanding warrants were recalled,
Mother missed four additional drug tests.[8]  Those missed tests, of
course, cannot be viewed in a vacuum.  Rather, they must be
viewed in the context of Mother's prior positive test for
amphetamine, methamphetamine, cocaine, her two prior positive
tests for marijuana, her admission of drug use (marijuana and
ecstasy), and her decision to abscond with the Minors (one of
whom had asthma and another who had a heart murmur that
required regular checkups).  Altogether, this was an unrebutted
basis to infer Mother's drug use was continuing, inhibiting her
judgment, and interfering with her ability to care for and protect

---

[8]     Mother argues we can only consider one of her 2018 no
shows for drug testing because we cannot "revisit or reexamine
the evidence on appeal," the juvenile court erroneously stated at
the jurisdiction hearing that Mother had only one missed test
after she and the Minors returned, and the Department did not
correct the court.  Mother misreads the pertinent case law.  While
we will not reweigh the evidence when reviewing jurisdiction
findings (*In re I.J.* (2013) 56 Cal.4th 766, 773), we will not ignore
evidence in the record simply because the parties and the
juvenile court overlooked it.

16

the Minors.  Though they had obviously aged a year since the filing of the petition, they were still young children of "tender years" susceptible to a more acute risk of harm from drug abuse.

"The overarching goal of dependency proceedings is to safeguard the welfare of California's children."  (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.)  Under the circumstances here, no substantial evidence supports the juvenile court's decision to decline to assume jurisdiction over the Minors—effectively returning them without supervision to parents who were not even present for the jurisdiction hearing and had unaddressed drug use problems.[9]

---

[9]     Because we resolve the appeal on these grounds, we need not reach the Department and Minors' arguments regarding the disentitlement doctrine.

DISPOSITION

The juvenile court's October 18, 2018, order dismissing the petition is reversed, and the matter is remanded to the juvenile court with directions to vacate its order dismissing the petition, to make a new and different order assuming jurisdiction over the Minors under section 300, subdivision (b)(1), and to hold a hearing pursuant to section 358 at which it may consider the Minors' then-current circumstances when deciding what disposition is appropriate.

**CERTIFIED FOR PUBLICATION**


BAKER, J.

We concur:


RUBIN, P. J.


KIM, J.